**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| QWEST COMMUNICATIONS CORPORATION, | * * * * |
| Plaintiff, | * * |
| v. | Case No.: RWT 07cv2199 |
| MARYLAND-NATIONAL CAPITAL PARK & PLANNING COMMISSION, | * * * |
| Defendant. | * * |

*** 

## MEMORANDUM OPINION

Plaintiff Qwest Communications Corporation ("Qwest") seeks a declaration that the rate for use of a right-of-way proposed by Defendant Maryland-National Capital Park & Planning Commission ("M-NCPPC") in a draft license agreement is prohibitive and thus preempted by 47 U.S.C. § 253 of the Federal Telecommunications Act ("FTA") via the Supremacy Clause of the United States Constitution. Because (1) Qwest no longer seeks injunctive relief and (2) the Court determines that § 253 does not authorize a private cause of action, Qwest's request for declaratory relief is barred by the mootness doctrine. Accordingly, the Court will, by separate order, deny Qwest's Motion for Partial Summary Judgment (Paper No. 60), grant M-NCPPC's Cross-Motion for Partial Summary Judgment (Paper No. 64), and dismiss the First and Second Claims for Relief in Qwest's Second Amended Complaint.

## I

Qwest is a company that provides telecommunications services to residents, businesses, and governmental entities in the state of Maryland, nationally, and internationally. Second Am. Compl. ¶¶ 11–12 (Paper No. 30). On June 30, 1999, Qwest entered into a network construction

agreement with American Communication Services of Maryland, Inc. d/b/a e.spire ("ACS"). Id. ¶ 28. As part of that agreement, Qwest purchased two of eight conduits that ACS planned to construct on a route along a portion of the Little Falls Parkway in Montgomery County, Maryland. Id. ¶ 29.

The M-NCPPC is a bi-county agency empowered to acquire, develop, maintain, and administer a regional system of parks within Montgomery and Prince George's Counties.[1] Id. ¶ 13. On September 22, 1999, ACS entered into a license agreement with the M-NCPPC that permitted ACS to install and operate an eight conduit telecommunications system along 4,435 feet of the Little Falls Parkway right-of-way in exchange for an annual payment of $3.50/foot/conduit. Id. ¶¶ 21–24. In 2000, after ACS completed construction on the conduit system, Qwest installed fiber optic cable and other equipment in the Little Falls Parkway right-of-way. Id. ¶ 29.

In 2002, ACS, after filing for bankruptcy, transferred all interest in its conduit system, and assigned the ACS/M-NCPPC license agreement, to Xspedius Management Company of Maryland, LLC d/b/a Xspedius Communications ("Xspedius"). Id. ¶ 25. On October 27, 2004, Xspedius and M-NCPPC entered into "Amendment No. 1" to the ACS/M-NCPPC License Agreement. Id. ¶ 27. Amendment No. 1 reflected the transfer of interest and assignment and increased the annual rate for use of the Little Falls Parkway right-of-way to $4.20/foot/conduit. Id.

Meanwhile, on July 1, 2004, Xspedius informed the M-NCPPC that two of the eight conduits had been transferred to Qwest. Id. ¶ 31. On August 3, 2004, the M-NCPPC in turn

---

[1] The M-NCPPC also performs planning functions in those counties. See, e.g., Md. Ann. Code art. 28, § 7-111(b) (2009) (describing the functions of the planning boards of the Maryland-Washington Regional District).

notified Qwest that it would be required to enter into a separate license agreement with the M-NCPPC for the use of the Little Falls Parkway right-of-way. Id. ¶ 32. Nearly a year later, the M-NCPPC sent Qwest and Xspedius a draft of a proposed license agreement. Id. ¶ 36. By February of 2006, the parties had agreed to language in a license agreement, which included an annual rate of $4.20/foot/conduit for use of the Little Falls Parkway right-of-way. Id. ¶ 37.

As a further condition for entering into the license agreement, M-NCPPC requested that Qwest pay allegedly unpaid back license fees for use of the right-of-way for earlier periods, which amounted to $333,849.52. Id. ¶ 40. By e-mail dated March 29, 2007, Qwest agreed to pay the disputed back license fees at a rate of $4.20/foot/conduit upon a reservation of rights. Id. ¶ 46. On June 13, 2007, Qwest paid the M-NCPPC $294,732.82 under protest for the disputed back license fees. Id. ¶ 49.

In the meantime, on April 6, 2007, the M-NCPPC tendered to Qwest a new draft license agreement, increasing the rate for use of the right-of-way by more than 600% from $4.20/foot/conduit to $26.00/foot/conduit. Id. ¶ 47. This did not go over well with Qwest and, although the parties scheduled a meeting for August 10, 2007 to discuss the new draft license agreement, id. ¶ 51, the meeting was later cancelled, id. ¶ 52, and Qwest never agreed to the rate of $26.00/foot/conduit.

On August 17, 2007, Qwest expressed its displeasure by filing a Complaint against M-NCPPC, which it has amended twice. In the Second Amended Complaint, Qwest's First Claim for Relief alleges that the "exorbitant and discriminatory" fees contained in M-NCPPC's proposed license agreement are preempted by § 253 of the FTA under the Supremacy Clause of the United States Constitution. Id. ¶¶ 62, 63. Qwest's Second Claim for Relief alleges that Qwest is entitled to a declaration under the Declaratory Judgment Act, 28 U.S.C. § 2201, that

certain provisions of the proposed license agreement violate § 253 of the FTA under the Supremacy Clause. Id. ¶¶ 67–69. Finally, Qwest's Third Claim for Relief alleges that Qwest unjustly enriched the M-NCPPC through the payment of the disputed back license fees. Id. ¶¶ 70–74. Also in the Second Amended Complaint, Qwest seeks a declaration that the provisions of the proposed license are preempted, an injunction enjoining the M-NCPPC from enforcing the proposed license agreement, a refund of the disputed back license fees, and such other relief as the Court considers just and proper. Id. X. Request for Relief. The M-NCPPC filed counterclaims for equitable accounting relating to Qwest's prior use of the Little Falls Parkway right-of-way ("Count I") and for unjust enrichment ("Count II"). See M-NCPPC's Countercl. ¶¶ 11–21 (Paper No. 41).

After filing the Second Amended Complaint, Qwest agreed with other telecommunications companies to participate in a build-around of the Little Falls Parkway right-of-way. Pl.'s Mot. for Summ. J. ¶ 46 (Paper No. 60). On March 31, 2009, Qwest completed the relocation of its facilities, and the construction costs due to the build-around were approximately $200,000. Id.; see also Def.'s Opp'n & Cross-Mot. for Summ. J. ¶ 24 (Paper No. 64); Pl.'s Reply 7 n.2 (Paper No. 65). Qwest has no equipment, facilities, or interests in the Little Falls Parkway right-of-way at this time. Def.'s Opp'n & Cross-Mot. for Summ. J. ¶ 25.

Qwest has moved for summary judgment as to its First and Second Claims for Relief (Paper No. 60), and the M-NCPPC has filed a cross-motion for summary judgment as to Qwest's First and Second Claims for Relief (Paper No. 64). Both parties agree that Qwest's Third Claim for Relief and Counts I and II of M-NCPPC's counterclaims present issues appropriate for trial, which has been scheduled to begin on May 26, 2010. Pl.'s Mot. for Summ. J. 3 n.4; Def.'s Opp'n & Cross-Mot. for Summ. J. 11 n.3.

In evaluating summary judgment motions, a court must assess whether there are any issues of material fact and whether the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)(2). "A material fact is one that 'might affect the outcome of the suit under the governing law.'" Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. Anderson, 477 U.S. at 248.

Although this case is at the summary judgment stage, a court must at all times during the pendency of litigation ensure itself of its jurisdiction. Litigation may become moot during the pendency of litigation, and federal courts have no power to hear moot cases. See Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997). The mootness doctrine is rooted in the "case" or "controversy" language in Article III of the U.S. Constitution and requires an actual case or controversy to be present before jurisdiction may be exercised. See DaimlerChrysler Corp v. Cuno, 547 U.S. 332, 340–42 (2006). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)).

Whether this Court has jurisdiction to address the preemption issue in this case depends at least in part on § 253 of the FTA. Section 253, entitled "Removal of barriers to entry," provides in relevant part:

(a) In general

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority
Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority
Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights of way on a non-discriminatory basis, if the compensation required is publicly disclosed by such government.

(d) Preemption
If, after notice and an opportunity to public comment, the [Federal Communications Commission ("FCC")] determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the [FCC] shall pre-empt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

Of relevance here, subsection (a) proscribes "local legal requirement[s]" that "prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." Subsection (c) preserves local government's authority "to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis." Finally, subsection (d) vests the FCC with the authority to preempt the enforcement of any legal requirements that violate subsections (a) or (b).

In its motion for summary judgment, Qwest argues that the MNCCPC's proposed license agreement is preempted by § 253 because the M-NCPPC's allegedly excessive right-of-way fee of $26.00/foot/conduit has the effect of prohibiting the ability of Qwest to provide

telecommunications service in violation of § 253(a) and is unfair and unreasonable in violation of § 253(c).  See Pl.'s Mot. for Summ. J. 20–25.

The M-NCPPC responds that Qwest's First and Second Claims for Relief are moot because the preemption issues are no longer "live" and Qwest lacks a legally cognizable interest in a decision by this Court on preemption.  The M-NCPPC points out that Qwest has abandoned any request to enjoin the M-NCPPC from charging the rate of $26.00/foot/conduit for use of the Little Falls Parkway right-of-way because it refused to pay the $26.00/foot/conduit, completely vacated the Little Falls Parkway on its own accord, and stopped seeking access to the Little Falls Parkway.  Def.'s Opp'n & Cross-Mot. for Summ. J. 10; Def.'s Reply 7–8. (Paper No. 66)  The M-NCPPC also contends that Qwest cannot assert a compensatory damages claim under the FTA because § 253 does not create a cause of action for monetary damages that can be enforced by itself or through the Declaratory Judgment Act.[2]  Def.'s Reply 6–8.  As a result, a determination and declaration by this Court that the proposed rate of $26.00/foot/conduit is preempted by § 253 of the FTA would be a mere advisory opinion according to the M-NCPPC.  Def.'s Opp'n & Cross-Mot. for Summ. J. 11.

Qwest counters that its First and Second Claims for Relief should not be barred as moot for several reasons.[3]  Qwest contends that its request for compensatory damages based on the

---

[2]  Qwest did not specifically request compensatory damages in its Second Amended Complaint, but the Court will consider its compensatory damages claim as subsumed within its request for "such other relief as this court considers just and proper" for two reasons:  first, Qwest did not have damages to claim from the build-around at the time it filed its Second Amended Complaint; and, second, since completing the build-around, Qwest has notified the M-NCPPC that it was seeking damages.  See Def.'s Surreply 2 n.3 (Paper No. 67).

[3]  In addition to the reasons discussed in this Memorandum Opinion, Qwest argued that the First and Second Claims for Relief were not moot because its liability under the M-NCPPC's unjust enrichment counterclaim may be as high as the rate of $26.00/foot/conduit.  See Pl.'s Reply 12; Pl.'s Surreply 1.  In its reply and at the hearing on February 5, 2010, the M-NCPPC

cost of building around the Little Falls Parkway right-of-way is a legally cognizable interest in a decision by this Court on the issue of preemption. Pl.'s Reply 12. The damages claim is sustainable, in Qwest's view under § 253 directly or through the Declaratory Judgment Act for a violation of § 253. Id.; Pl.'s Surreply 2–7 (Paper No. 67). Qwest also contends that the Court should apply the "capable of repetition, yet evading review" exception to the mootness doctrine because the M-NCPPC is likely to seek a rate of $26.00/foot/conduit from Qwest and other carriers in the future. See Pl.'s Reply 12. Each of these possible bases for exercising jurisdiction will be addressed in turn.

## A

Private rights of action to enforce federal laws must be created by Congress, either explicitly or implicitly. See Alexander v. Sandoval, 532 U.S. 275, 286 (2001). In Cort v. Ash, 422 U.S. 66, 78 (1975), the Supreme Court set forth a four-factor test to determine whether a statute implies a private right of action. The Cort factors include whether (1) the plaintiff is one of the class for whose special benefit the statute was enacted; (2) there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; (3) it is consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiff; and (4) the cause of action is one traditionally relegated to state law, in an area basically the concern of the States. Id.

Since Cort v. Ash, the Supreme Court has emphasized that the overarching factor is congressional intent. See, e.g., Thompson v. Thompson, 484 U.S. 174, 179 (1988) ("The intent

---

conceded that it was seeking underpayments for prior use of the Little Falls Parkway right-of-way at the rate of $4.20/foot/conduit, not $26.00/foot/conduit. See Def.'s Reply 7 ("[Qwest's unjust enrichment] claim is not predicated on a $26.00 foot/conduit rate."). Thus, the M-NCPPC's unjust enrichment counterclaim does not save the First and Second Claims for Relief from the bar of mootness.

of Congress remains the ultimate issue . . . ."); Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 15–16 (1979) ("[W]hat must ultimately be determined is whether Congress intended to create the private remedy asserted."); Touche Ross & Co. v. Redington, 442 U.S. 560, 575–76 (1979) ("The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action.  Indeed, the first three factors discussed in Cort—the language and focus of the statute, its legislative history, and its purpose . . .—are ones traditionally relied upon in determining legislative intent.").[4]

In determining congressional intent, a court must look to the text and structure of the federal law.  In particular, a court must focus on whether the statutory text creates "rights-creating language."  See Sandoval, 532 U.S. at 288.  "Rights-creating language" is language that "explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff."  See Cannon v. Univ. of Chi., 441 U.S. 677, 690 n.13 (1979).  In addition to explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests "an intent to create not just a private right but also a private remedy."  Sandoval, 532 U.S. at 286. If the statutory structure provides a discernible enforcement mechanism, a court may not imply a private right of action because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  Id. at 290.

Neither the Supreme Court nor the Fourth Circuit has addressed whether any subsection of § 253 of the FTA creates an implied private cause of action.  The only courts of appeals to

---

[4]  According to Justice Scalia in his concurring opinion in Thompson, the Supreme Court has overruled the analysis in Cort v. Ash:  "It could not be plainer that we effectively overruled the Cort v. Ash analysis in Touche Ross & Co. v. Redington, 442 U.S. 560, 575–76 (1979), and in Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 18 (1979), converting one of its four factors (congressional intent) into the determinative factor, with the other three merely indicative of its presence or absence."  484 U.S. at 189.  This Court, nevertheless, will use the Cort test in its analysis while recognizing that the overall objective is to ascertain congressional intent.

have directly addressed the question are the Sixth and Eleventh Circuits, and both have determined that, in certain contexts, § 253(c) of the FTA does authorize a private right of action in federal court for telecommunications providers seeking preemption of a state or local statute. See BellSouth Telecomms., Inc. v. Town of Palm Beach, 252 F.3d 1176, 1191 (11th Cir. 2001); TCG Detroit v. City of Dearborn, 206 F.3d 618, 624 (6th Cir. 2000). Those courts found a private right of action in § 253(c) based primarily on the limited enforcement power of the FCC under § 253(d) and the language and legislative history of § 253(c). See BellSouth, 252 F.3d at 1189–91; TCG Detroit, 206 F.3d at 624. As mentioned above, subsection (d) authorizes the FCC to "enforce" subsections (a) and (b), but not (c), and subsection (c) provides a limitation on the preemptive thrust of subsection (a) by preserving the right of local governments to impose fair and reasonable fees on telecommunications providers. The Sixth and Eleventh Circuits reasoned that since § 253(d) did not authorize the FCC to enforce § 253(c), telecommunications providers should be able to bring an independent cause of action for violation of § 253(c), such as for the imposition of unfair and unreasonable fees. See BellSouth, 252 F.3d at 1189–91; TCG Detroit, 206 F.3d at 624.

This Court disagrees, at least to the extent that BellSouth and TCG Detroit can be read as finding an implied right of action for damages. The only arguably "rights-creating" language contained in § 253 is in subsection (a), which provides that telecommunications providers shall be free of state or local requirements that act as a barrier to their services. Both subsections (b) and (c) limit the scope of subsection (a), and do not grant rights to telecommunications providers. Those subsections protect the rights of state and local governments to be free of the otherwise broad preemptive thrust of subsection (a) so that certain local prerogatives can be

preserved.[5]  That subsection (d) withholds the authority to "enforce" subsection (c) from the FCC does not, in this Court's view, reflect an intent by Congress to allow for private rights of action under subsection (c).  Subsection (c) does not contain a "right" of a telecommunications provider to enforce; rather, it merely establishes a limitation on the preemptive thrust of subsection (a), the enforcement of which is left to the FCC, not telecommunications providers.  If subsections (b) and (c) create any "rights," they are rights of State and local governments, not telecommunications providers.

The legislative history associated with the amendment eliminating the FCC's authority to enforce subsection (c) supports this conclusion.  The version of subsection (d) initially proposed in the Senate version of the bill did not exclude subsection (c) from the FCC's preemptive authority.[6]  Concerned about preemption and converting local governance questions into federal questions, Senators Feinstein and Kempthorne proposed an amendment which struck the entire preemption section.  141 Cong. Rec. S8134-01, S8169 (daily ed. June 12, 1995) (statement of Sen. Feinstein).  In response, Senator Gorton proposed the current version of subsection (d).  In so doing, he stated that "local powers should be retained locally, that any challenge[s] to them

---

[5]  It is unclear why subsection (d) authorizes the FCC to preempt an action by a State government that violates subsection (b) when, in this Court's view, subsection (b) restricts the rights created in subsection (a).  No matter how a court construes the language and legislative history of § 253, there will be inconsistencies.

[6]  The version of subsection (d) proposed by the Senate read as follows:

(d)  Preemption.—If, after notice and an opportunity for public comment, the [FCC] determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates or is inconsistent with this section, the [FCC] shall immediately preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

S. Rep. No. 104-230, at 96 (1995).

take place in the Federal district court in that locality and that the [FCC] not be able to preempt such actions."  141 Cong. Rec. S8206-02, S8213 (daily ed. June 13, 1995) (statement of Sen. Gorton).

While some courts have construed Senator Gorton's remarks as creating a private right of action in subsection (c), this Court respectfully disagrees.  First, Senator Gorton's comments show that the exclusion of subsection (c) was intended to <u>restrict the preemptive authority</u> of the FCC, not to create a right in telecommunications providers to sue for damages under subsection (c).  Second, to the extent that Senator Gorton's remarks suggest that private entities should be able to challenge local actions as preempted under § 253 in federal district courts, they are not sufficiently clear to imply a private <u>damages remedy</u> or to overcome the plain language of § 253(c), which focuses on the preservation of the authority of State and local government, not the rights of telecommunications providers.

To construe the language otherwise could lead to the absurd result that an absolute barrier to telecommunications service could be addressed by the FCC's preemptive authority, while a prohibitively expensive compensation requirement having the same effect could not be acted upon by the FCC and providers could recover damages in court actions that the FCC could not award.  Senator Gorton's amendment thus presents a bit of "[a] Puzzlement."  <u>See</u> Richard Rodgers and Oscar Hammerstein II, <u>A Puzzlement</u>, <u>in</u> <u>The King and I</u> (20th Century Fox 1956).  While the statutory language in some respects "creates more questions than it answers about what causes of action Congress intended to create and who it intended to enforce them," <u>BellSouth</u>, 252 F.3d at 1189, it is clear that subsection (c) simply does not contain "rights-creating" language, but rather contains restrictions on rights, a factor of vital importance in any analysis of congressional intent.

The most that arguably can be said in interpreting the effect of Senator Gorton's amendment is that where, as here, a telecommunications provider is contending that a barrier to its service has been imposed in violation of subsection (a) that is economic in nature and not saved by subsection (c), the provider may, based on the Supremacy Clause, seek a determination from a district court that the barrier is preempted. Cf. Qwest Commc'ns Corp v. City of Greensboro, 440 F. Supp. 2d 480, 491 (M.D.N.C. 2006) ("[A] reasonable interpretation of Senator Gorton's remarks is that Senator Gorton merely meant to give the federal district courts, rather than the FCC, authority to rule on the issue of preemption."). To interpret a federal court's authority to extend beyond the power to preempt would do violence to the entire scheme of § 253, which is to provide for preemption of barriers, and nothing more. Senator Gorton was not seeking to create a private cause of action, but rather to change the arena for a preemption debate from the FCC to the federal courts where the barrier is alleged to be an economic one not saved by subsection (c). See 141 Cong. Rec. S8206-02, S8212 (daily ed. June 13, 1995) (statement of Sen. Gorton) ("[The proposed amendment] does not impact the substance of the first three subsections of this section at all, but it does shift the forum in which a question about those three subsections is decided."). Here, however, there is nothing left to preempt and, in the absence of a damages remedy, the case is moot.

Of considerable assistance here are cases discussing whether Congress intended telecommunications providers to be able to bring a cause of action under 42 U.S.C. § 1983 for a violation of the FTA. To sustain an action under § 1983, the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which plaintiff belongs. See Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002). Even after this showing, "there is only a rebuttable presumption that the right is enforceable under § 1983."

Blessing v. Freestone, 520 U.S. 329, 341 (1997). The defendant may defeat this presumption by demonstrating that the statute created a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Id.

In City of Rancho Palos Verdes, California v. Abrams, the Supreme Court held that telecommunications providers may not bring a cause of action for damages under § 1983 for a violation of a separate provision of the FTA, 47 U.S.C. § 332. See 544 U.S. 113, 121–22 (2005). The Supreme Court based its holding on its determination that Congress intended the judicial remedy defined in 47 U.S.C. § 332 to foreclose § 1983 relief. Id. at 1462. In a footnote, the Supreme Court also acknowledged, but did not resolve, a split in the lower courts as to whether compensatory damages would be available directly under 47 U.S.C. § 332 of the FTA. See id. at 122 n.3 (comparing PrimeCo Personal Commc'n, Ltd. P'ship v. Mequon, 352 F.3d 1147, 1152–53 (7th Cir.2003) (finding that damages are presumptively available), with Omnipoint Commc'ns MB Operations, LLC v. Lincoln, 107 F. Supp. 2d 108, 120–21 (D. Mass. 2000) (stating that injunctive relief is the appropriate remedy for a violation of the FTA)).

Several courts of appeals have held that telecommunications providers cannot bring a cause of action for damages under 42 U.S.C. § 1983 for a violation of 47 U.S.C. § 253 of the FTA—the provision at issue in this case. See Nextg Networks of NY, Inc. v. City of New York, 513 F.3d 49, 52 (2d Cir. 2008) ("[A] telecommunications provider may not bring a cause of action for damages under Section 1983 for violations of Section 253 of the Telecommunications Act of 1996."); Sw. Bell Tel., LP v. City of Houston, 529 F.3d 257, 262 (5th Cir. 2008) ("[B]ecause the FTA does not unambiguously establish a private enforceable right, and, in the alternative, because FTA § 253(d) contains a comprehensive enforcement scheme, Congress did not intend to create a private right, enforceable under § 1983, for claimed violations of FTA

§ 253(a).”); Sprint Telephony PCS, L.P. v. County of San Diego, 490 F.3d 700, 716–18 (9th Cir. 2007) (finding no cause of action for damages under § 1983 for violation of § 253), aff'd, 543 F.3d 571, 580–81 (9th Cir. 2008) (en banc), cert. denied, 129 S. Ct. 2860 (2009); Qwest Corp v. City of Santa Fe, 380 F.3d 1258, 1265–67 (10th Cir. 2004) (finding no clear manifestation of congressional intent to create a federal right through § 1983 for violation of § 253).

These circuits have determined that nothing in the text or structure of § 253 indicates an intention to create a private right enforceable under § 1983. See NextG, 513 F.3d at 52–53; Sw. Bell, 529 F.3d at 261–62; Sprint, 490 F.3d at 717; Santa Fe, 380 F.3d at 1265. Their decisions explain that (1) the language of the FTA is not focused on the benefits granted to the telecommunications providers; (2) the legislative history reflects Congress' intent to authorize the FCC, not telecommunications providers, to enforce § 253(a) and (b); and (3) Congress's clear language creating a private right of action in other sections of the FTA (e.g., 47 U.S.C. § 274(e)) indicates a lack of intent to create one in § 253. See e.g., Santa Fe, 380 F.3d at 1265–67. In this circuit, the District of North Carolina undertook a thorough analysis as to why it, like these other courts of appeals, concluded that Congress did not intend to create a private right enforceable under § 253. See City of Greensboro, 440 F. Supp. 2d at 491–92.

For purposes of determining whether § 253 creates a private right of action, the § 1983 decisions (i.e., NextG, Sw. Bell, Sprint, and Santa Fe) are as instructive as the BellSouth and TCG Detroit decisions. While the question of whether a statutory violation may be enforced through § 1983 "is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute," Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 508 n.9 (1990), "the inquiries overlay in one meaningful respect—in either case we must first determine whether Congress intended to create a federal right," Gonzaga, 536 U.S. at 283.

Accordingly, a "court's role in discerning whether personal rights exist in the § 1983 context should not differ from its role in discerning whether personal rights exist in the implied right of action context." Gonzaga, 536 U.S. at 285.

This Court agrees with the analyses in these § 1983 cases and finds no congressional intent to create a private right of action in § 253. The first Cort factor—whether § 253 was enacted to benefit telecommunications providers—favors finding no private right of action. Subsection (a) of § 253 prohibits local government from imposing barriers to entry for telecommunications providers. While the text of subsection (a) evinces Congress' intent to protect telecommunications providers from local government actions that impede their service, it is equally clear from subsection (d) that the authority to preempt those barriers was given to the FCC, not telecommunications providers. Subsection (d) provides the FCC with authority to enforce subsections (a) and (b) of § 253, and that enforcement scheme suggests that Congress intended to preclude an enforcement role for telecommunication providers. See Sandoval, 532 U.S. at 290. Moreover, subsection (c) contains no "rights-creating language." Subsection (c) preserves certain local regulatory prerogatives in light of the prohibition on barriers to entry in subsection (a). The text of § 253 as a whole clearly indicates Congress' intent to protect telecommunications services by allowing the FCC to override local barriers, while preserving certain local prerogatives.

The second Cort factor—whether there is any indication of legislative intent, explicit or implicit, to create or to deny a monetary damages remedy for telecommunications providers for violations of § 253—weighs heavily against any private right of action for damages. Neither the text of § 253 nor its legislative history mentions the recovery of damages for violations of § 253. It would be inconsistent with the legislative history and language of § 253 to authorize a remedy

for damages under subsection (c), but not for subsections (a) and (b) where the only remedy is a preemptive order by the FCC. The Court will not infer an intent to provide a monetary damages remedy from Congress's silence.

The third <u>Cort</u> factor—whether it is consistent with the underlying purpose of the FTA to imply a private right of action—does not favor Qwest. At first blush, allowing a private right of action under § 253(c) might seem consistent with the FTA's stated purpose of promoting competition in the telecommunications market. Yet, preemptive authority is given to the FCC, not to telecommunications providers, and while the availability of monetary damages and attorney's fees under § 253 arguably would promote competition in the telecommunications market, there simply is no evidence of congressional intent to provide private remedies to telecommunications providers claiming to be injured by local actions.

The final <u>Cort</u> factor—whether the cause of action is one relegated to state law in an area basically a concern of the states—also does not favor implying a private right of action. Because the FTA is national in scope, and the question of whether a local action is preempted by federal law is of national concern, one might think that this factor favors Qwest. However, consistent with the national import of the FTA, Congress assigned preemptive authority to the FCC, which favors not implying a private right of action in telecommunications providers. In any event, this factor, is not one "traditionally relied upon in determining legislative intent." <u>Touche Ross</u>, 442 U.S. at 575–76 (1979).

In sum, the Court concludes that the statute's text, structure, and legislative history demonstrate that Congress did not intend to vest telecommunications providers with a private right of action for monetary damages under § 253. Accordingly, Qwest's theory that § 253

creates an implied private cause of action under which it can seek compensatory damages does not save Qwest's First and Second Claims for Relief from the bar of mootness.[7]

## B

The Declaratory Judgment Act of 1934, 28 U.S.C. § 2201, entitled "Creation of a Remedy," provides that in "a case or actual controversy," a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." "The operation of the Declaratory Judgment Act is procedural only. Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950) (quotation marks and citations omitted). A party can file a motion for further relief requesting monetary damages under 28 U.S.C. § 2202 to effectuate a prior declaratory judgment. See 28 U.S.C. § 2202 ("Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.").

Qwest argues that notwithstanding the lack of a private right of action under § 253, it may recover damages as "further relief" under § 2202. See Pl.'s Surrepl 6. Qwest is misguided. In order to obtain "further relief" under § 2202, Qwest first must identify a "case or actual controversy" that entitles it to a declaration that the draft license agreement is preempted by

---

[7] In the Court's Memorandum Opinion denying the M-NCPPC's Motion To Dismiss the Second Amended Complaint, the Court found that the issue of preemption had "not been rendered moot by Qwest's apparent decision to 'build around'" the Little Falls Parkway right-of-way because of the "possible damages that may have been sustained by Qwest in this case." See Qwest Commc'ns Corp. v. Md.-Nat'l Capital Park & Planning Comm'n, 598 F. Supp. 2d 704, 707 (D. Md. 2009). At that time, the M-NCPPC had not yet challenged the availability of a private right of action under § 253. Now that the issue has been fully briefed, the Court concludes that monetary damages are not available to telecommunications providers under § 253 and that Qwest's decision to build around the Little Falls Parkway right-of-way has rendered the preemption issue moot.

§ 253 of the FTA. As stated above, Qwest no longer seeks injunctive relief under the Supremacy Clause, and the Court concludes that there is no private right of action for damages under § 253. Allowing Qwest to proceed in a declaratory judgment action with § 253 as the source of the underlying substantive law is tantamount to allowing a private cause of action. The Declaratory Judgment Act cannot be used to circumvent Congress' intent not to provide telecommunications providers with a private cause of action under § 253. Because Qwest has failed to identify an independent jurisdictional basis for its declaratory judgment action, its compensatory damages claim under § 2202 does not save the First and Second Claims for Relief from the bar of mootness.

### C

Federal courts may consider disputes, although moot, that are "capable of repetition, yet evading review." Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 462 (2007); Roe v. Wade, 410 U.S. 113, 125 (1973). Jurisdiction on this basis is limited to the exceptional situation in which "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." Spencer v. Kemna, 523 U.S. 1, 17 (1998) (alterations and quotation marks omitted). There must be a "demonstrated probability" that the challenged action will recur again and to Qwest. See Murphy v. Hunt, 455 U.S. 478, 483 (1982). Qwest bears the burden of demonstrating that the exception applies. See Brooks v. Vassar, 462 F.3d 341, 348 (4th Cir. 2006).

Qwest argues that the capable of repetition, yet evading review exception should apply because "there is a reasonable chance that the M-NCPPC and Qwest or other carriers could do business again." See Pl.'s Reply 12 (emphasis added). This reasonable chance derives from the

M-NCPPC's alleged management of "extensive right-of-way along major thoroughfares in Montgomery County and Prince George's County," and the likelihood that Qwest and other carriers "will continue building out and improving their telecommunications networks." Id.

First, it is insufficient as a matter of law to argue that the challenged conduct may recur as to others; it must be as to the same complaining party. See Spencer, 523 U.S. at 17. Second, it appears to be a remote possibility, at best, that it will recur as to Qwest. Qwest operates most of its business outside of Maryland, and the M-NCPPC governs a regional system of parks, not roads, in only two counties in Maryland. Accordingly, the Court finds it highly unlikely that Qwest will seek access to any property administered by the M-NCPPC in the future. See Qwest's Annual Report (Form 10-K), at 1 (Feb. 16, 2010) ("We offer data, Internet, video and voice services within the 14-state region of Arizona, Colorado, Idaho, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington and Wyoming. We refer to this region as our local service area."). See DeFunis v. Odegaard, 416 U.S. 312, 319 (1974) (refusing to extend the "capable of repetition, yet evading review" exception to an applicant who was denied admission to a law school but graduated from another law school before his challenge to the admissions procedures could be reached by the Supreme Court). Qwest has utterly failed to show a "reasonable expectation" that the M-NCPPC will again subject Qwest, as opposed to other telecommunications providers, to a $26.00/foot/conduit rate for use of any right-of-way under its jurisdiction. Consequently, the "capable of repetition, yet evading review" exception to the mootness doctrine does not serve as a basis for this Court to decide the preemption issues in the First and Second Claims for Relief.

**III**

In conclusion, the Court concludes that the First and Second Claims for Relief in Qwest's Second Amended Complaint are moot. Accordingly, the Court will, by separate order, deny Qwest's Motion for Partial Summary Judgment (Paper No. 60), grant M-NCPPC's Cross-Motion for Partial Summary Judgment (Paper No. 64), and dismiss First and Second Claims for Relief in Qwest's Second Amended Complaint.

Date: May 13, 2010

_____

/s/

ROGER W. TITUS
UNITED STATES DISTRICT JUDGE